UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ENG BOCK CHIA, RUI GUI WU, YUE MING LIN, GRACE WU, CINDY LIN, XIN QIANG YU, GUI XIANG DONG, CHIN KOK HING, WAI HO NG, JIANWEI XU, and WONG KAM FOONG,<br><br>Plaintiffs,<br><br>- against -<br><br>520 ASIAN RESTAURANT CORP. d/b/a CHEF YU, 5127 RESTAURANT CORP. d/b/a GINGER'S, TUNG SHENG YEH, STEVEN C.J. TANG, ALICE TANG, KUAN YOKE AKOON aka "WINNIE," TEO SU JIN, BENNY CHEONG, and/or other persons or entities affiliated with or controlled by 520 ASIAN RESTAURANT CORP. d/b/a CHEF YU and/or 5127 RESTAURANT CORP. d/b/a GINGER'S and/or TUNG SHENG YEH, STEVEN C.J. TANG, ALICE TANG, KUAN YOKE AKOON aka "WINNIE," TEO SU JIN, and/or BENNY CHEONG, individually,<br><br>Defendants. | **Index No.:** 17-CV-5885 (GHW)<br><br>**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

Plaintiffs Eng Bock Chia, Rui Gui Wu, Yue Ming Lin, Grace Wu, Cindy Lin, Xin Qiang Yu, Gui Xiang Dong, Chin Kok Hing, Wai Ho Ng, and Jian Wei Xu, hereby submit their proposed findings of fact and conclusions of law:

## PLAINTIFFS' PROPOSED FINDINGS OF FACT

1. Plaintiffs' claims under New York Law date, at the earliest, to August 4, 2011 (6 years before the initial complaint was filed on August 4, 2017). (Stipulated Fact No. 1).

2. Plaintiffs' claims under the Fair Labor Standards Act date, at the earliest, to August 4, 2014 (3 years before the initial complaint was filed on August 4, 2017). (Stipulated Fact No. 2).

3. Chin Kok Hing worked at Gingers as a server from at least August 4, 2011 through April 2, 2017. (Stipulated Fact No. 3).

4. Eng Bock Chia worked at Chef Yu as a server from at least August 4, 2011 through April 9, 2017. (Stipulated Fact No. 4).

5. Gui Xian Dong worked at Gingers as a server from January 10, 2013 to June 27, 2014. (Stipulated Fact No. 5).

6. Jian Wei Xu worked at Chef Yu as a server from at least August 4, 2011 through April 17, 2015. (Stipulated Fact No. 6).

7. Rui Gui Wu worked at Chef Yu as a server from at least August 4, 2011 through April 9, 2017. (Stipulated Fact No. 7).

8. Wai Ho Ng worked at Chef Yu as a server from August 1, 2013 through November 23, 2016. (Stipulated Fact No. 8).

9. Xin Qiang Yu worked at Chef Yu as a server from at least August 4, 2011 through February 15, 2018. (Stipulated Fact No. 9).

10. Yue Ming Lin worked at Chef Yu as a server from at least August 4, 2011 through April 9, 2017. (Stipulated Fact No. 10).

11. Cindy Lin worked at Gingers as a packer from at least August 4, 2011 through the date that Ginger's closed. Cindy Lin also worked at Chef Yu as a packer from June 1, 2016 through July 31, 2017.  (Stipulated Fact No. 11).

12. Grace Wu worked at Gingers as a server from at least August 4, 2011 until at least November 30, 2012. (Stipulated Fact No. 12).

13. Plaintiffs were all employees of Gingers and/or Chef Yu. (Stipulated Fact No. 13).

14. Defendant Steven C.J. Tang was a manager of Chef Yu, had the power to hire and fire employees, handled payroll, and had the power to address all other employee and restaurant matters. (Stipulated Fact No. 14; Exhibit 32, Defendants' Answer to Plaintiffs' Second Amended

2

Complaint, ¶¶ 85-86, 89, 105, 106).

15. Defendant Benny Cheong was a manager of Gingers, had the power to hire and fire employees, handled payroll, and had the power to address all other employee and restaurant matters. (Stipulated Fact No. 15; Exhibit 32, Defendants' Answer to Plaintiffs' Second Amended Complaint, ¶¶ 85-86, 89, 105, 106).

16. Defendant Teo Su Jin (a/k/a Douglas) was a manager of Chef Yu from at least August 4, 2011 through October 2016 and during that time, he had the power to hire and fire employees, handled payroll, and had the power to address all other employee and restaurant matters. (Stipulated Fact No. 16; Exhibit 32, Defendants' Answer to Plaintiffs' Second Amended Complaint, ¶¶ 85-86, 89, 105, 106).

17. Defendant Steven C.J. Tang is an employer under the FLSA for all Plaintiffs. (Stipulated Fact No. 17; Exhibit 32, Defendants' Answer to Plaintiffs' Second Amended Complaint, ¶¶ 85-86, 89, 105, 106).

18. Defendant Steven C.J. Tang is an employer and/or agent under NY Labor Law for all Plaintiffs. (Stipulated Fact No. 18; Exhibit 32, Defendants' Answer to Plaintiffs' Second Amended Complaint, ¶¶ 85-86, 89, 105, 106).

19. Defendant Kuan Yoke Akoon (a/k/a Winnie) is an employer under the FLSA for all Plaintiffs. (Stipulated Fact No. 19; Exhibit 32, Defendants' Answer to Plaintiffs' Second Amended Complaint, ¶¶ 85-86, 89).

20. Defendant Kuan Yoke Akoon (a/k/a Winnie) is an employer and/or agent under NY Labor Law for all Plaintiffs. (Stipulated Fact No. 20; Exhibit 32, Defendants' Answer to Plaintiffs' Second Amended Complaint, ¶¶ 85-86, 89).

21. Defendant Benny Cheong is an employer under the FLSA for all Plaintiffs.  (Stipulated

Fact No. 21; Exhibit 32, Defendants' Answer to Plaintiffs' Second Amended Complaint, ¶¶ 85-86, 89, 99, 105, 106).

22. Defendant Benny Cheong is an employer and/or agent under NY Labor Law for all Plaintiffs. (Stipulated Fact No. 22; Exhibit 32, Defendants' Answer to Plaintiffs' Second Amended Complaint, ¶¶ 85-86, 89, 99, 105, 106).

23. Defendant Tung Sheng Yeh (a/k/a Peter) is an employer under the FLSA for all Plaintiffs. (Stipulated Fact No. 23; Exhibit 32, Defendants' Answer to Plaintiffs' Second Amended Complaint, ¶¶ 85-86, 89, 105, 106).

24. Defendant Tung Sheng Yeh (a/k/a Peter) is an employer and/or agent under NY Labor Law for all Plaintiffs. (Stipulated Fact No. 24; Exhibit 32, Defendants' Answer to Plaintiffs' Second Amended Complaint, ¶¶ 85-86, 89, 105, 106).

25. Defendant Teo Su Jin (a/k/a Douglas) is an employer under the FLSA. (Stipulated Fact No. 25; Exhibit 32, Defendants' Answer to Plaintiffs' Second Amended Complaint, ¶¶ 85-86, 89, 105, 106).

26. Defendant Teo Su Jin (a/k/a Douglas) is an employer and/or agent under NY Labor Law. (Stipulated Fact No. 26; Exhibit 32, Defendants' Answer to Plaintiffs' Second Amended Complaint, ¶¶ 85-86, 89, 105, 106).

27. Each of the individual Defendants is a shareholder and part owner of Defendant 520 Asian Restaurant Corp. and Defendant 5127 Restaurant Corp. (Stipulated Fact No. 27; Exhibit 36; Exhibit 32, Defendants' Answer to Plaintiffs' Second Amended Complaint, ¶ 94).

28. 520 Asian Restaurant Corp. d/b/a Chef Yu  was, at all relevant times, an "enterprise," pursuant to 29 U.S.C. § 203(s)(1)(A), engaged in commerce or otherwise worked on goods or

materials that have been moved or produced for commerce, and has no less than $500,000.00 in annual gross volume of sales made or business done.  (Stipulated Fact No. 28).

29. 5127 Restaurant Corp. d/b/a Gingers was, at all relevant times, an "enterprise," pursuant to 29 U.S.C. § 203(s)(1)(A), engaged in commerce or otherwise worked on goods or materials that have been moved or produced for commerce, and has no less than $500,000.00 in annual gross volume of sales made or business done.  (Stipulated Fact No. 29).

30. Between August 4, 2011 and July 31, 2013 Plaintiffs were not paid overtime wages. (Stipulated Fact No. 30).

31. Between August 4, 2011 and July 31, 2013 Plaintiffs were not paid spread of hours compensation. (Stipulated Fact No. 31).

32. Between August 4, 2011 and July 31, 2013 Plaintiffs were paid a flat amount for their hours worked on either a weekly or bi-weekly basis. (Stipulated Fact No. 32).

33. Defendants transferred several employees from Ginger's to Chef Yu, including Douglas. (Exhibit 32, Defendants' Answer to Plaintiffs' Second Amended Complaint, ¶ 101).

34. During the relevant time, when Chef Yu was short on kitchen staff, kitchen staff from Ginger's were sent to Chef Yu to work at the restaurant. (Exhibit 32, Defendants' Answer to Plaintiffs' Second Amended Complaint, ¶ 102).

35. Benny, Steven, Peter, and Winnie discussed changing Plaintiff Cindy Lin's schedule as a result of the lawsuit. (Deposition of Defendant Benny Cheong "Cheong Dep." 128:5-129:9).[2]

36. Benny, Steven, Peter, and Winnie discussed changing Plaintiff Cindy Lin's pay as a result of the lawsuit. (Cheong Dep. 129:10-130:3).

---

[2] Electronic, text-searchable copies of all deposition transcripts have been submitted to the Court on a CD-ROM.

**Defendant Steven C.J. Tang ("Steven")**

37. Steven is the signor of the leases for Chef Yu and Gingers. (Exhibit 32, Defendants' Answer to Plaintiffs' Second Amended Complaint, ¶ 93).

38. Since 2016, Steven has been responsible for preparing the documents given to the accountant for corporate tax returns for Chef Yu. (Tang Dep. 63:23-64:10)

39. Since 2016, Steven is at Chef Yu five days a week. (Tang Dep. 51:11-15).

40. Steven's day to day responsibilities as the manager at Chef Yu include managing time schedules, managing the workers, managing complaints from clients, and giving a hand if workers are behind during busy times. (Tang Dep. 52:6-53:16)

41. Steven hired all managers for Chef Yu and Gingers. (Exhibit 32, Defendants' Answer to Plaintiffs' Second Amended Complaint, ¶ 95).

**Defendant Teo Su Jin ("Douglas")**

42. Douglas provided the sales figures to the accountant David Cheng each month for the purpose of filing corporate tax returns. (Deposition of Teo Su Jin "Jin Dep." 113:9-5; 114:6-13; 114:14-21).

43. Douglas assisted in managing the operations of Gingers when Benny was away from the business, typically for vacations. (Exhibit 32, Defendants' Answer to Plaintiffs' Second Amended Complaint, ¶ 97).

**Defendant Benny Cheong ("Benny")**

44. Benny was offered the position of manager at Gingers by Steven, Peter, and Winnie. (Cheong Dep. 22:2-25).

45. Benny signed the Ginger's lease termination agreement on behalf of Peter, as president of 5127 Asian Restaurant. Corp. (Cheong Dep. pp. 43:21-46:13).

6

46. Benny reported to Chef Yu to check on the business, collect the restaurant's cash and receipts, assist with the restaurant's bookkeeping, and assist with the restaurant's operations whenever either Douglas or Steven were unavailable to oversee the restaurant. (Exhibit 32, Defendants' Answer to Plaintiffs' Second Amended Complaint, ¶ 99).

**Defendant Kuan Yoke Akoon ("Winnie")**

47. Winnie assisted Steven, Peter, and Benny with forming the corporation for Gingers by helping with the opening and renovation of the restaurant, including helping with the menu, the interior design, and setting up the tables and the silverware. (Akoon Dep. 15:12-16:21)

48. Winnie assisted in the opening of Chef Yu by helping with the design of the menu, interior design, table setups, plans, pictures. (Akoon Dep. 28:12-23).

49. Winnie attended monthly shareholder meetings with Peter, Benny, and Steven. (Akoon Dep. 42:8-21).

50. Winnie assisted in managing the operations of Gingers when Benny was away from the business, typically for vacations. (Exhibit 32, Defendants' Answer to Plaintiffs' Second Amended Complaint, ¶ 97).

51. Since 2011, Winnie helped at Gingers when Benny took vacation by taking care of customers, handling Health Department and Fire Department inspections, and handling large orders of take out. (Akoon Dep. 48:6-14)

**Defendant Tung Sheng Yeh ("Peter")**

52. Peter made the decision to promote Douglas from being a waiter at Ginger's to being the manager of Chef Yu. (Tang Dep. 67:18-68:15).

53. Defendant Benny signed the Ginger's lease termination agreement on behalf of Peter, as President of 5127 Asian Restaurant Corp. (Cheong Dep. pp. 43:21-46:2).

54. Peter hired all managers for Chef Yu and Gingers. (Exhibit 32, Defendants' Answer to Plaintiffs' Second Amended Complaint, ¶ 95).

**<u>Facts Relevant to All Plaintiffs</u>**

55. Defendants never notified Plaintiffs at Chef Yu or Gingers orally or in writing that their minimum wages and overtime wages were subject to a "tip credit" at anytime throughout their employment. (Affidavit of Eng Bock Chia "Chia Affidavit" ¶¶ 33, 43; Affidavit of R.G. Wu "R.G. Wu Affidavit" ¶¶ 30, 41, 52; Affidavit of Yue Ming Lin "Y.M. Lin Affidavit" ¶¶ 32, 43, 53; Affidavit of Grace Wu "Wu Affidavit" ¶¶ 21; Affidavit of Xin Qiang Yu "Yu Affidavit" ¶¶ 28, 40; Affidavit of Gui Xian Dong "Dong Affidavit" ¶¶ 20, 31; Affidavit of Chin Kok Hing "Hing Affidavit" ¶¶ 22, 34, 44; Affidavit of Wai Ho Ng "Ng Affidavit" ¶¶ 18, 26, 34; Affidavit of Jian Wei Xu "Xu Affidavit" ¶¶ 23, 33).

56. Servers at Chef Yu perform side work such as cleaning the bathroom, preparing string beans, snow peas, and wontons, stacking dishes and putting them into place, folding napkins, and gathering ice into buckets and bringing it from the basement to the main floor. (Tang Dep. 97:4-98:25).

57. Server's side work took place before the first customer comes in, between the lunch and dinner crowds, and after the dinner crowd. (Tang Dep. 97:4-98:25).

58. Servers at Chef Yu and Gingers shared tips with employees that did not regularly interact with customers. (Chia Aff. ¶¶ 57-60; R.G. Wu Aff. ¶¶ 63-66; Y.M. Lin Aff. ¶¶ 62-63; Wu Aff. ¶¶ 34-39; Yu Aff. ¶ 52; Dong Aff. ¶¶ 44-47; Hing Aff. ¶¶ 55-58; Ng Aff. ¶¶ 44-46).

59. Chef Yu had a "restaurant policy" of requiring servers to pay for a customer's unpaid bill from their tips. (Tang Dep. 122:7-123:20; Chia Aff. ¶56; R.G. Wu Aff. ¶67, Y.M. Lin Aff. ¶ 64; Yu Aff. ¶ 51; Ng Aff. ¶ 47; Xu Aff. ¶ 46).

60. If customers failed to pay their bill at least two times in one day, Gingers required servers to pay half of the bill. (Cheong Dep. 97:15-98:4).

61. Employees were required to wear restaurant and job appropriate attire while working at Chef Yu and Ginger's. (Exhibit 32, Defendants' Answer to Plaintiffs' Second Amended Complaint, ¶ 80; Chia Aff. ¶ 50; R.G. Wu Aff. ¶ 56, Y.M. Lin Aff. ¶ 58; Wu Aff. ¶ 28; Yu Aff. ¶ 46; Dong Aff. ¶ 36; Hing Aff. ¶ 49; Ng Aff. ¶ 38; Xu Aff. ¶ 40).

62. Plaintiffs who worked at Defendant Chef Yu were given 1 to 2 sets of uniforms by the Defendants. Plaintiffs purchased additional sets at their own expense. (Exhibit 32, Defendants' Answer to Plaintiffs' Second Amended Complaint, ¶ 81; Chia Aff. ¶¶ 51-54; R.G. Wu Aff. ¶¶ 57-60, Y.M. Lin Aff. ¶¶ 59-60; Yu Aff. ¶¶ 47-49; Ng Aff. ¶¶ 39-42; Xu Aff. ¶¶ 41-44).

63. Plaintiffs who worked at Defendant Gingers were not given any uniforms. Plaintiffs purchased all sets at their own expense. (Wu Aff. ¶¶ 29-32; Dong Aff. ¶¶ 38-42; Hing Aff. ¶¶ 50-53).

64. Plaintiffs who worked at Defendants Chef Yu and Gingers did not receive any additional pay for the cost of his uniform or to clean his uniform. (Chia Aff. ¶ 55; R.G. Wu Aff. ¶ 61, Y.M. Lin Aff. ¶ 61; Wu. Aff. ¶ 33; Yu Aff. ¶ 50; Dong Aff. ¶43; Hing Aff. ¶ 54; Ng Aff. ¶ 43; Xu Aff. ¶ 45).

65. Plaintiffs who worked at Defendants Chef Yu and Gingers never saw any posters or notices hanging up at the restaurant explaining their rights as employees under the law. (Chia Aff. ¶ 27; R.G. Wu Aff. ¶ 24, Y.M. Lin Aff. ¶ 26; Wu. Aff. ¶ 15; Yu Aff. ¶ 23; Dong Aff. ¶ 14; Hing Aff. ¶ 16; Ng Aff. ¶ 14; Xu Aff. ¶ 18).

**Plaintiff Eng Bock Chia (aka "Bernard")**

66. Plaintiff Chia went by the name "Bernard" at Chef Yu. (Chia Affidavit ¶ 3).

67. When Plaintiff Chia was hired, he did not receive any kind of notice or statement informing him of how he would be paid. (Chia Affidavit ¶ 5).

68. From 2011 until July of 2013:

    a.  Plaintiff Chia's was paid a flat rate of $300 every two weeks, or $600 per month, plus tips. (Chia Affidavit ¶ 28).

    b.  Plaintiff Chia's typically worked 64 hours per week. (Chia Affidavit ¶ 29).

    c.  Typically, five days per week Plaintiff Chia's start and stop time exceeded 10 hours. (Chia Affidavit ¶ 30).

    d.  Plaintiff Chia did not receive spread of hours pay of an additional hour for every day he was at work for more than 10 hours.  (Chia Affidavit ¶ 31).

    e.  Plaintiff Chia did not receive any overtime pay for the hours he worked over 40 each week. (Chia Affidavit ¶ 32).

    f.  Plaintiff Chia was paid less than the minimum wage rate. (Chia Affidavit ¶ 34).

    g.  Plaintiff Chia did not receive any wage notices during this time. (Chia Affidavit ¶ 35).

    h.  Plaintiff Chia never clocked in and out. Plaintiff Chia does not know if his actual working hours were tracked by the restaurant in any way. (Chia Affidavit ¶ 36).

    i.  Plaintiff Chia usually arrived 10 to 25 minutes before his scheduled shift time. (Chia Affidavit ¶ 37).

j.  Plaintiff Chia almost always worked later than his scheduled end time, anywhere from 15 to 30 minutes, because he had to complete his side work after all of his customers left. On a few occasions, it was up to an hour. (Chia Affidavit ¶ 38).

69. From August 2013 through 2017

a.  Between August 2013 and July 2014, Plaintiff Chia typically worked 45 to 48 hours a week (after discounting for breaks).  During this time period he was typically at work for more than 10 hours a day for 4 or 5 days each week. (Chia Affidavit ¶ 39).

**b.**  Between approximately August 2014 and October 2016, Plaintiff Chia typically worked 41 to 45 hours per week (after discounting for breaks). During this time period he was typically at work for more than 10 hours a day for 4 days each week. (Chia Affidavit ¶ 40).

**c.**  Between October or November 2016, until April 2017, Plaintiff Chia typically worked 36 to 38 hours per week (after discounting for breaks). During this time period, he was typically at work for more than 10 hours a day 4 days each week.  (Chia Affidavit ¶ 41).

d.  Plaintiff Chia was paid by the hour, but was paid less than the minimum wage rate. (Chia Affidavit ¶ 42).

e.  Plaintiff Chia's paystubs during this time did not always list how many hours he worked or contain hourly rates for his regular work, overtime work, or spread of hours. (Chia Affidavit ¶ 44).

f.  Plaintiff Chia was not paid the correct overtime rate. (Chia Affidavit ¶ 45).

g.  Plaintiff Chia was sometimes paid spread of hours and sometimes not. (Chia Affidavit ¶ 46).

h. Plaintiff Chia did not clock in and out. There was a sign in sheet, but it did not track the exact hours he worked.  It just had his scheduled work hours. (Chia Affidavit ¶ 47).

i. Douglas told the servers, including Plaintiff Chia, to fill in their scheduled time not their actual hours worked. (Chia Affidavit ¶ 47).

j. Plaintiff Chia usually arrived 10 to 25 minutes before his scheduled shift time. (Chia Affidavit ¶ 48).

k. Plaintiff Chia almost always worked later than his scheduled end time, anywhere from 15 to 30 minutes, because he had to complete his side work after all of his customers left. On a few occasions, it was up to an hour. (Chia Affidavit ¶ 49).

**Plaintiff Rui Gui Wu (aka "Annie")**

70. Plaintiff R.G. Wu went by the name "Annie at Chef Yu." (R.G. Wu Affidavit ¶ 3).

71. When Plaintiff R.G. Wu was hired, she did not receive any kind of notice or statement informing her of how she would be paid. (R.G. Wu Affidavit ¶ 5).

72. For the period of 2011 through July of 2013:

a. Plaintiff R.G. Wu typically worked 64 hours per week. (R.G. Wu Affidavit ¶ 26).

b. Plaintiff R.G. Wu was typically at work for more than 10 hours a day for 5 days each week. (R.G. Wu Affidavit ¶ 27).

c. Plaintiff R.G. Wu was paid a flat rate of $300 every two weeks, or $600 per month, plus tips. (R.G. Wu Affidavit ¶ 25).

d. Plaintiff R.G. Wu did not receive overtime pay for the hours she worked over 40 each week. ((R.G. Wu Affidavit ¶ 28).

    e.   Plaintiff R.G. Wu did not receive spread of hours pay of an additional hour for everyday that she was at work for more than 10 hours. (R.G. Wu Affidavit ¶ 29).

    f.   Plaintiff R.G. Wu was paid less than the minimum wage. (R.G. Wu Affidavit ¶ 31).

    g.   Plaintiff R.G. Wu did not receive any wage notices. (R.G. Wu Affidavit ¶ 32).

    h.   Plaintiff R.G. Wu did not receive paystubs for most of this time period. (R.G. Wu Affidavit ¶ 33).

    i.   Plaintiff R.G. Wu did not clock in and out and does not know if her actual working hours were tracked by the restaurant in any way. (R.G. Wu Affidavit ¶ 34).

    j.   Plaintiff R.G. Wu usually arrived 10 to 15 minutes before her scheduled shift time. (R.G. Wu Affidavit ¶ 35).

    k.   Plaintiff R.G. Wu almost always worked later than her scheduled end time, approximately 10 to 30 minutes, because the customers were still eating and she had to finish serving them and take care of other end of shift tasks. (R.G. Wu Affidavit ¶ 36).

73. For the period of August 2013 through July 2015:

    a.   From August 2013 through July 2014, Plaintiff R.G. Wu typically worked 45 to 48 hours per week after discounting for breaks, and for the period of July 2014 to July 2015, she typically worked 35 to 45 hours per week after discounting for breaks. (R.G. Wu Affidavit ¶ 37).

    b.   Plaintiff R.G. Wu was typically at work for more than 10 hours a day for 4 or 5 days each week. ((R.G. Wu Affidavit ¶ 38).

    c.   Plaintiff R.G. Wu was sometimes paid spread of hours but did not always receive it when she was supposed to. ((R.G. Wu Affidavit ¶ 39).

d.  Plaintiff R.G. Wu's paystubs did not always list her overtime hours, and when her paystub did not list her overtime hours she did not get paid any wages for those hours. (R.G. Wu Affidavit ¶ 42).

e.  Plaintiff R.G. Wu was paid less than the minimum wage. ((R.G. Wu Affidavit ¶ 40).

f.  Plaintiff R.G. Wu was not paid for all the hours that she worked. (R.G. Wu Affidavit ¶ 43).

g.  Plaintiff R.G. Wu was not paid the correct overtime rate. (R.G. Wu Affidavit ¶ 44).

h.  Plaintiff R.G. Wu never clocked in and out. There was a sign in sheet, but it did not track the exact hours she worked. ((R.G. Wu Affidavit ¶ 45).

i.  Plaintiff R.G. Wu usually arrived 10 to 15 minutes before her scheduled shift time. (R.G. Wu Affidavit ¶ 46).

j.  Plaintiff R.G. Wu almost always worked later than her scheduled end time, approximately 10 to 30 minutes, because the customers were still eating and she had to finish serving them and take care of other end of shift tasks. (R.G. Wu Affidavit ¶ 36).

74.  For the period August 2015 through April 2017:

a.  From August 2015 to October 2016, Plaintiff R.G. Wu typically worked 34 to 35 hours per week after discounting for breaks, and from October 2016 to the end of her employment in April 2017, Plaintiff R.G. Wu typically worked 25 to 33 hours per week after discounting for breaks. (R.G. Wu Affidavit ¶ 48).

b.  Plaintiff R.G. Wu was typically at work for more than 10 hours a day for 4 days each week. (R.G. Wu Affidavit ¶ 49).

c.  Plaintiff R.G. Wu got paid some spread of hours pay, but did not receive it for all days that she was supposed to. (R.G. Wu Affidavit ¶ 50).

    d.  Plaintiff R.G. Wu was paid less than the minimum wage. (R.G. Wu Affidavit ¶ 51).

    e.  Plaintiff R.G. Wu was never notified that Chef Yu was paying her a tipped minimum wage nor was she ever given anything in writing about the restaurant taking a tip credit. (R.G. Wu Affidavit ¶ 52).

    f.  Plaintiff R.G. Wu never clocked in and out. There was a sign in sheet, but it did not track the exact hours she worked. (R.G. Wu Affidavit ¶ 53).

    g.  Plaintiff R.G. Wu usually arrived 10 to 15 minutes before her scheduled shift time. (R.G. Wu Affidavit ¶ 54).

    h.  Plaintiff R.G. Wu almost always worked later than her scheduled end time, approximately 10 to 30 minutes, because the customers were still eating and she had to finish serving them and take care of other end of shift tasks. (R.G. Wu Affidavit ¶ 55).

**Plaintiff Yue Ming Lin (aka "Wendy")**

75. Plaintiff Y.M. Lin went by the name "Wendy" at Chef Yu. (Y.M. Lin Affidavit ¶ 3).

76. When she was hired, Plaintiff Y.M. Lin did not receive any kind of notice or statement informing her of how she would be paid. (Y.M. Lin Affidavit ¶ 5).

77. For the period of 2011 through July of 2013:

    a.  Plaintiff Y.M. Lin typically worked 65 to 67 hours per week and typically did not receive any lunch breaks or other breaks. (Y.M. Lin Affidavit ¶ 28).

    b.  Plaintiff Y.M. Lin was typically at work for more than 10 hours a day for 5 days each week. (Y.M. Lin Affidavit ¶ 28).

    c.  Plaintiff Y.M. Lin was paid a flat rate of $300 every two weeks, or $600 per month, plus tips. (Y.M. Lin Affidavit ¶ 29).

    d.   Plaintiff Y.M. Lin did not receive overtime pay for the hours she worked over 40 each week. (Y.M. Lin Affidavit ¶ 30).

    e.   Plaintiff Y.M. Lin did not receive spread of hours pay of an additional hour for everyday that she was at work for more than 10 hours. (Y.M. Lin Affidavit ¶ 31).

    f.   Plaintiff Y.M. Lin was paid less than the minimum wage. (Y.M. Lin Affidavit ¶ 33).

    g.   Plaintiff Y.M. Lin did not receive any paystubs or wage notices. (Y.M. Lin Affidavit ¶ 34).

    h.   Plaintiff Y.M. Lin did not clock in and out and does not know if her actual working hours were tracked by the restaurant in any way. (Y.M. Lin Affidavit ¶ 35).

    i.   Plaintiff Y.M. Lin usually arrived 10 to 15 minutes before her scheduled shift time. After changing into her uniform, Plaintiff Y.M. Lin started working right away which was about 10 minutes before her scheduled shift time. (Y.M. Lin Affidavit ¶ 36).

    j.   Plaintiff Y.M. Lin almost always worked later than her scheduled end time, approximately 20 to 30 minutes, because the customers were still eating and she had to finish serving them and take care of other end of shift tasks. (Y.M. Lin Affidavit ¶ 37).

    k.   On Fridays and Saturdays, Plaintiff Y.M. Lin typically worked 40 minutes past her scheduled shift time because it was very busy on those days. (Y.M. Lin Affidavit ¶ 37).

78. For the period of August 2013 through July 2014:

    a.   Plaintiff Y.M. Lin typically worked 46 hours per week, after discounting for breaks. (Y.M. Lin Affidavit ¶ 38).

    b.   Plaintiff Y.M. Lin was typically at work for more than 10 hours a day for 5 days each week. (Y.M. Lin Affidavit ¶ 39).

c.  Plaintiff Y.M. Lin was sometimes paid spread of hours and sometimes not. (Y.M. Lin Affidavit ¶ 41).

d.  Plaintiff Y.M. Lin was usually paid for the hours she worked over 40, but sometimes she was not paid for all of these hours. (Y.M. Lin Affidavit ¶ 41).

e.  Plaintiff Y.M. Lin's paystubs did not list her hours worked or rate of pay. (Y.M. Lin Affidavit ¶ 40).

f.  Plaintiff Y.M. Lin was paid less than the minimum wage. (Y.M. Lin Affidavit ¶ 42).

g.  Plaintiff Y.M. Lin was not paid the correct overtime rate. (Y.M. Lin Affidavit ¶ 44).

h.  Plaintiff Y.M. Lin never clocked in and out. There was a sign in sheet, but it did not track the exact hours she worked. (Y.M. Lin Affidavit ¶ 45).

l.   Plaintiff Y.M. Lin usually arrived 10 to 15 minutes before her scheduled shift time. After changing into her uniform, Plaintiff Y.M. Lin started working right away which was about 10 minutes before her scheduled shift time. (Y.M. Lin Affidavit ¶ 46).

m.  Plaintiff Y.M. Lin almost always worked later than her scheduled end time, approximately 20 to 30 minutes, because the customers were still eating and she had to finish serving them and take care of other end of shift tasks. (Y.M. Lin Affidavit ¶ 47).

n.  On Fridays and Saturdays, Plaintiff Y..M. Lin typically worked 40 minutes past her scheduled shift time because it was very busy on those days. (Y.M. Lin Affidavit ¶ 47).

79. For the period of August 2014 through April 2017:

a.   Beginning in August 2014, Plaintiff Y.M. Lin continued to work around 46 hours per week after discounting for breaks. (Y.M. Lin Affidavit ¶ 48).

b.   Beginning in August 2015 and continuing through the end of her employment in April 2017, Plaintiff Y.M. Lin typically worked 34 to 39.5 hours per week after discounting for breaks. (Y.M. Lin Affidavit ¶ 48).

c.   Plaintiff Y.M. Lin was typically at work for more than 10 hours a day for 4 days each week. (Y.M. Lin Affidavit ¶ 49).

d.   Plaintiff Y.M. Lin usually got paid some spread of hours pay, but did not receive it for all days that she was supposed to. Y.M. (Lin Affidavit ¶ 50).

e.   Plaintiff Y.M. Lin's paystubs did not list her hours worked or rate of pay. (Y.M. Lin Affidavit ¶ 51).

f.   Plaintiff Y.M. Lin was paid by the hour but it was less than the minimum wage. (Y.M. Lin Affidavit ¶ 52).

g.   Plaintiff Y.M. Lin was not paid the correct overtime rate. (Y.M. Lin Affidavit ¶ 54).

h.   Plaintiff Y.M. Lin never clocked in and out. There was a sign in sheet, but it did not track the exact hours she worked. (Y.M. Lin Affidavit ¶ 55).

i.   Plaintiff Y.M. Lin usually arrived 10 to 15 minutes before her scheduled shift time. After changing into her uniform, Plaintiff Y.M. Lin started working right away which was about 10 minutes before her scheduled shift time. (Y.M. Lin Affidavit ¶ 46).

j.   Plaintiff Y.M. Lin almost always worked later than her scheduled end time, approximately 20 to 30 minutes, because the customers were still eating and she had to finish serving them and take care of other end of shift tasks. (Y.M. Lin Affidavit ¶ 47).

k.   On Fridays and Saturdays, Plaintiff Y..M. Lin typically worked 40 minutes past her scheduled shift time because it was very busy on those days. (Y.M. Lin Affidavit ¶ 47).

**Plaintiff Grace Wu**

80. When Plaintiff Wu was hired, she did not receive any kind of notice or statement informing her of how she would be paid. (Wu Affidavit ¶ 4).

81. Plaintiff Wu typically worked 62.5 to 65.5 hours per week. (Wu Affidavit ¶ 16).

82. Plaintiff Wu was typically at work for more than 10 hours a day for 5 days each week. (Wu Affidavit ¶ 17).

83. Plaintiff Wu was paid a flat rate of $300 every two weeks, or $600 per month, plus tips. (Wu Affidavit ¶ 18).

84. Plaintiff Wu did not receive overtime pay for the hours she worked over 40 each week. (Wu Affidavit ¶ 19).

85. Plaintiff Wu did not receive spread of hours pay of an additional hour for everyday that she was at work for more than 10 hours. (Wu Affidavit ¶ 20).

86. Plaintiff Wu was paid less than the minimum wage. (Wu Affidavit ¶ 22).

87. Plaintiff Wu did not receive any paystubs or wage notices for most of her employment. (Wu Affidavit ¶ 23).

88. For a few months in 2012, Plaintiff Wu received paystubs but they did not list her hours worked or her rate of pay. (Wu Affidavit ¶ 24).

89. Plaintiff Wu did not clock in and out and does not know if her actual working hours were tracked by the restaurant in any way. (Wu Affidavit ¶ 25).

90. Plaintiff Wu usually arrived 10 to 15 minutes before her scheduled shift time. (Wu Affidavit ¶ 26).

91. Plaintiff Wu almost always worked later than her scheduled end time to finish up what she was working on and take care of other end of shift tasks. (Wu Affidavit ¶ 27).

**Plaintiff Cindy Lin (aka "Yue Xian Lin")**

92. Plaintiff Lin was employed at both Gingers and Chef Yu as a packer. (Affidavit of Cindy Lin "Lin Aff." ¶ 2).

93. When Plaintiff Lin was hired to work at Gingers in 2011, she did not receive any kind of notice or statement informing her of how she would be paid. (Lin Affidavit ¶ 22).

94. When Plaintiff Lin was hired to work at Chef Yu in 2016, she did not receive any kind of notice or statement informing her of how she would be paid. (Lin Affidavit ¶ 23).

95. For the period 2011 through April 2016:

    a.   During this time period Plaintiff Lin only worked at Gingers. (Lin Affidavit ¶ 26).

    b.   Plaintiff Lin typically worked 60 hours per week. (Lin Affidavit ¶ 28).

    c.   Plaintiff Lin was typically at work for more than 10 hours each day six days per week. (Lin Affidavit ¶ 30).

    d.   Plaintiff Lin was paid a flat rate every two weeks. (Lin Affidavit ¶ 27).

    e.   Beginning in approximately 2011, Plaintiff Lin received approximately $2,100 per month.  (Lin Affidavit ¶ 27).

    f.   In 2016, Plaintiff Lin's flat rate increased to approximately $2,300 per month. (Lin Affidavit ¶ 27).

    g.   Plaintiff Lin also received tips from the tip pool, about $75 per week. (Lin Affidavit ¶ 27).

    h.   Plaintiff Lin did not receive any overtime pay for the hours she worked over 40 each week. (Lin Affidavit ¶ 31).

  i. Plaintiff Lin did not receive spread of hours pay of an additional hour for every day she was at work for more than 10 hours.  (Lin Affidavit ¶ 32).

  j. Plaintiff Lin never clocked in and out and does not know if her actual working hours were tracked by the restaurant in any way. (Lin Affidavit ¶ 33).

  k. Plaintiff Lin's scheduled hours were from 12 pm to 10 pm six days each week. Three days per week, Plaintiff Lin worked approximately 15 minutes past 10pm. (Lin Affidavit ¶ 29).

96. For the period of May 2016 through July 2017:

  a. Plaintiff Lin worked one day per week as a packer at Chef Yu in addition to working as a packer at Gingers. (Lin Affidavit ¶ 34).

  b. Plaintiff Lin typically worked Sundays at Chef Yu for a 9-hour shift (after discounting for breaks). (Lin Affidavit ¶ 35).

  c. Plaintiff Lin was paid a flat rate of $100 per day for her work at Chef Yu. (Lin Affidavit ¶ 36).

  d. During this time, Plaintiff Lin also still worked 6 days each week at Gingers, but only worked on Saturdays, from 4:00 pm to 10 pm. (Lin Affidavit ¶ 37).

  e. The other 5 days Plaintiff Lin was scheduled to work from 12 pm to 10 pm. (Lin Affidavit ¶ 37).

  f. Three days per week, Plaintiff Lin worked approximately 15 to 20 minutes after 10 pm. (Lin Affidavit ¶ 37).

  g. During this time, Plaintiff Lin worked a total of 7 days a week and 66 hours each week (after discounting for breaks).   (Lin Affidavit ¶ 38).

h.  Plaintiff Lin was paid a flat rate every two weeks for her work at Gingers. (Lin Affidavit ¶ 39).

i.  Plaintiff Lin received about $2,300 to $2,400 per month at this time, plus tips. (Lin Affidavit ¶ 39).

j.  Plaintiff Lin was typically at work for more than 10 hours each day five days per week. (Lin Affidavit ¶ 40).

k.  Plaintiff Lin did not receive spread of hours pay of an additional hour for every day she was at work for more than 10 hours.  (Lin Affidavit ¶ 42).

l.  Plaintiff Lin did not receive any overtime pay for the hours she worked over 40 each week. (Lin Affidavit ¶ 41).

m.  Plaintiff Lin never clocked in and out, and does not know if her actual working hours were tracked by the restaurant in any way. (Lin Affidavit ¶ 43).

97. For the period August 2017 through January 2018:

a.  Starting around August 2017 and until the restaurant closed, Plaintiff Lin only worked at Gingers. (Lin Affidavit ¶ 44).

b.  Plaintiff Lin worked 40 hours per week (after discounting for breaks). (Lin Affidavit ¶ 44).

c.  Plaintiff Lin was paid $11 per hour. (Lin Affidavit ¶ 44).

d.  Plaintiff Lin was paid half of her money in cash and half of her money by check. (Lin Affidavit ¶ 46).

e.  Around August 2017, Defendant Benny told Plaintiff Lin that he had received two letters saying that she had sued the restaurant, asked her if she was aware of the lawsuit, and told her that because she was suing them, he would change her work schedule and

give her fewer hours of work. (Lin Affidavit ¶ 45).

f.   Benny told Plaintiff Lin she would now only be scheduled to work for 40 hours a week
     and would be paid $11 per hour by check. (Lin Affidavit ¶ 46).

g.   Benny told Plaintiff Lin that her hours were being cut and given to another packer
     named Judy who was not suing him and who had only been working part-time before.
     (Lin Affidavit ¶ 47).

h.   On August 31, 2017, Plaintiff Lin took a few photographs at the restaurant with her cell
     phone camera to show that Benny was still paying other workers in cash, such as Wen
     Wei and Mr. Chin. (Lin Affidavit ¶¶ 48-49).

**Plaintiff Xin Qiang Yu (aka "Kenny")**

98. Plaintiff Yu went by the name "Kenny" at Chef Yu. (Yu Affidavit ¶ 3).

99. When Plaintiff Yu was hired, he did not receive any kind of notice or statement informing him
    of how he would be paid. (Yu Affidavit ¶ 6).

100. For the period of 2011 to July of 2013:

a.   Plaintiff Yu typically worked 53.5 hours per week. (Yu Affidavit ¶ 25).

b.    Plaintiff Yu was typically at work for more than 10 hours a day for 4 days each week.
      (Yu Affidavit ¶ 26).

c.    Plaintiff Yu was paid a flat rate of $350 every two weeks, or $700 per month, plus tips.
      (Yu Affidavit ¶ 24).

d.    Plaintiff Yu did not receive overtime pay for the hours he worked over 40 each week.
      (Yu Affidavit ¶ 30).

e.  Plaintiff Yu did not receive spread of hours pay of an additional hour for everyday that he was at work for more than 10 hours. (Yu Affidavit ¶ 27).

f.  Plaintiff Yu was paid less than the minimum wage rate. (Yu Affidavit ¶ 29).

g.  Plaintiff Yu never clocked in and out and does not know if his actual working hours were tracked by the restaurant in any way. (Yu Affidavit ¶ 31).

h.  Plaintiff Yu usually arrived 10 to 15 minutes before his scheduled shift time and started his work 5 to 10 minutes early. (Yu Affidavit ¶ 32).

i.  Plaintiff Yu usually worked 10 to 15 minutes past his scheduled end time because the customers were still there, and servers had to stay until the customers to left to clean up after them. (Yu Affidavit ¶ 33).

101. For the period August 2013 to 2018:

a.  Between approximately August 2013 and September 2015, Plaintiff Yu generally worked 40.5 to 43.5 hours per week (after discounting for breaks) and was typically at work for more than 10 hours a day for 4 days each week. (Yu Affidavit ¶ 34).

b.  In around October 2015, Plaintiff Yu's hours went down to 18.5 hours a week (after discounting for breaks), and he was typically at work for more than 10 hours a day for 2 days each week. (Yu Affidavit ¶ 35).

c.  Between approximately November 2015 and April 2017, Plaintiff Yu generally worked approximately 14.5 hours per week, after discounting breaks, and was typically at work for more than 10 hours a day for 1 day each week. (Yu Affidavit ¶ 36).

d.  Between approximately May 2017 to when Plaintiff Yu stopped working, Plaintiff Yu generally worked 13.5 hours per week, after discounting breaks, and was typically at work for more than 10 hours a day for 1 day each week. (Yu Affidavit ¶ 37).

e.  Plaintiff Yu was sometimes paid spread of hours and sometimes not. (Yu Affidavit ¶ 38).

f.  Plaintiff Yu was paid by hour, but was paid less than the minimum wage rate. (Yu Affidavit ¶ 39).

g.  Plaintiff Yu was not paid the correct overtime wage rate. (Yu Affidavit ¶ 41).

h.  For many years, Plaintiff Yu's paystubs did not show his hours worked or rate of pay. (Yu Affidavit ¶ 42).

i.  Plaintiff Yu never clocked in and out. There was a sign in sheet, but it did not track the exact hours he worked.  (Yu Affidavit ¶ 43).

j.  Plaintiff Yu usually arrived 10 to 15 minutes before his scheduled shift time and started his work 5 to 10 minutes early. (Yu Affidavit ¶ 44).

k.  Plaintiff Yu usually worked 10 to 15 minutes past his scheduled end time. (Yu Affidavit ¶ 45).

**Plaintiff Gui Xiang Dong (aka "Bobo")**

102. Plaintiff Dong went by the name "Bobo" at Gingers. (Dong Affidavit ¶ 3).

103. When she was hired, Plaintiff Dong did not receive any kind of notice or statement informing her of how she would be paid. (Dong Affidavit ¶ 5).

104. For the period of January 2013 through July 2013:

a.  Plaintiff Dong typically worked 52 to 55 hours per week. (Dong Affidavit ¶ 15).

b.  Plaintiff Dong was typically at work for more than 10 hours a day for 5 days each week. (Dong Affidavit ¶ 16).

c. Plaintiff Dong was paid a flat rate of $300 every two weeks, or $600 per month, plus tips. (Dong Affidavit ¶ 17).

d. Plaintiff Dong did not receive overtime pay for the hours she worked over 40 each week. (Dong Affidavit ¶ 18).

e. Plaintiff Dong did not receive spread of hours pay of an additional hour for everyday that he was at work for more than 10 hours. (Dong Affidavit ¶ 19).

f. Plaintiff Dong was paid less than the minimum wage. (Dong Affidavit ¶ 21).

g. Plaintiff Dong did not begin to receive paystubs until approximately April 2013, however her paystubs did not list how many hours she worked or her rate of pay. (Dong Affidavit ¶¶ 22-23).

h. Plaintiff Dong did not clock in and out and does not know if her actual working hours were tracked by the restaurant in any way. (Dong Affidavit ¶ 24).

i. Plaintiff Dong usually arrived 5 to 10 minutes before her scheduled shift time. (Dong Affidavit ¶ 25).

j. Plaintiff Dong usually worked 10 to 30 minutes past her schedule end time because the customers were still there and she had to finish serving them and cleaning up. (Dong Affidavit ¶ 26).

105. For the period of August 2013 through 2014:

a. Plaintiff Dong typically worked 45 to 46 hours per week, after discounting for breaks. (Dong Affidavit ¶ 27).

b. Plaintiff Dong was typically at work for more than 10 hours a day for 5 days each week. (Dong Affidavit ¶ 28).

c.   Plaintiff Dong's paystubs did not show all of the hours that she worked. (Dong Affidavit ¶ 29).

d.   Plaintiff Dong was paid less than the minimum wage. (Dong Affidavit ¶ 30).

e.   Plaintiff Dong was not paid the correct overtime wage rate. (Dong Affidavit ¶ 32).

f.   Plaintiff Dong never clocked in and out. There was a sign in sheet, but it did not track the exact hours she worked. (Dong Affidavit ¶ 33).

g.   Plaintiff Dong usually arrived 5 to 10 minutes before her scheduled shift time. (Dong Affidavit ¶ 34).

h.   Plaintiff Dong usually worked 10 to 30 minutes past her schedule end time because the customers were still there and she had to finish serving them and cleaning up. (Dong Affidavit ¶ 35).

**Plaintiff Chin Kok Hing**

106. For the period of 2011 through July of 2013:

a.   Plaintiff Hing typically worked 60 hours per week and did not receive regular breaks. (Hing Affidavit ¶ 17).

b.   Plaintiff Hing was typically at work for more than 10 hours a day for 5 days each week. (Hing Affidavit ¶ 18).

c.   Plaintiff Hing was paid a flat rate of $300 every two weeks, or $600 per month, plus tips. (Hing Affidavit ¶ 19).

d.   Plaintiff Hing did not receive overtime pay for the hours he worked over 40 each week. (Hing Affidavit ¶ 20).

e.   Plaintiff Hing did not receive spread of hours pay of an additional hour for everyday that he was at work for more than 10 hours. (Hing Affidavit ¶ 21).

f.  Plaintiff Hing was paid less than the minimum wage. (Hing Affidavit ¶ 23).

g.  Plaintiff Hing did not receive any paystubs or wage notices. (Hing Affidavit ¶ 24).

h.  Plaintiff Hing did not clock in and out and does not know if his actual working hours were tracked by the restaurant in any way. (Hing Affidavit ¶ 25).

i.  Plaintiff Hing usually arrived 10 minutes before his scheduled shift time. (Hing Affidavit ¶ 26).

j.  Plaintiff Hing usually worked later than his schedule end time because the restaurant was busy and he had to finish up what he was working on. (Hing Affidavit ¶ 27).

107. For the period of August 2013 through 2014:

a.  Plaintiff Hing typically worked 45 to 46 hours per week, after discounting for breaks. (Hing Affidavit ¶ 28).

b.  Plaintiff Hing was typically at work for more than 10 hours a day for 5 days each week. (Hing Affidavit ¶ 29).

c.  In 2013, Plaintiff Hing was not paid spread of hours pay of an additional hour for every day that he was at work for more than 10 hours. (Hing Affidavit ¶ 30).

d.  In 2014, Plaintiff Hing was not always paid spread of hours pay of an additional hour for every day that he was at work for more than 10 hours. (Hing Affidavit ¶ 31).

e.  Plaintiff Hing's paystubs did not list how many hours he worked or contain his rate of pay. (Hing Affidavit ¶ 32).

f.  Plaintiff Hing was paid less than the minimum wage. (Hing Affidavit ¶ 33).

g.  Plaintiff Hing was not paid the correct overtime wage rate. (Hing Affidavit ¶ 35).

h.  Plaintiff Hing never clocked in and out. There was a sign in sheet, but it did not track the exact hours he worked. (Hing Affidavit ¶ 36).

  i. Plaintiff Hing usually arrived 10 minutes before his scheduled shift time. (Hing Affidavit ¶ 37).

  j. Plaintiff Hing usually worked approximately 15 to 30 minutes past his scheduled end time because the restaurant was busy and he had to finish up what he was working on. (Hing Affidavit ¶ 38).

108. For the period 2015 through 2017:

  a. Beginning in 2015, Plaintiff Hing continued to work approximately 46 hours per week, after discounting for breaks. (Hing Affidavit ¶ 39).

  b. Towards the end of 2015 and through 2017, Plaintiff Hing worked approximately 38 to 40 hours per week, after discounting for breaks. (Hing Affidavit ¶ 40).

  c. Plaintiff Hing was typically at work for more than 10 hours a day for 2 to 3 days each week. (Hing Affidavit ¶ 41).

  d. Plaintiff Hing's paystubs did not list his hours worked or contain his rate of pay. (Hing Affidavit ¶ 42).

  e. Plaintiff Hing was paid less than the minimum wage rate. (Hing Affidavit ¶ 43).

  f. Plaintiff Hing was not paid the correct overtime rate. (Hing Affidavit ¶ 45).

  g. Plaintiff Hing never clocked in and out. There was a sign in sheet, but it did not track the exact hours he worked. (Hing Affidavit ¶ 46).

  h. Plaintiff Hing usually arrived 10 minutes before his scheduled shift time. (Hing Affidavit ¶ 47).

  i. Plaintiff Hing usually worked approximately 15 to 30 minutes past his scheduled end time because the restaurant was busy and he had to finish up what he was working on. (Hing Affidavit ¶ 48).

**Plaintiff Wai Ho Ng (aka "Samson")**

109. Plaintiff Ng went by the name "Samson" at Chef Yu. (Ng Affidavit ¶ 3).

110. When he was hired, Plaintiff Ng did not receive any kind of notice or statement informing him of how he would be paid. (Ng Affidavit ¶ 5).

111. For the period of August 2013 through March 2014:

   a. Plaintiff Ng typically worked 18 to 22.5 hours per week after discounting for breaks. (Ng Affidavit ¶ 15).

   b. Occasionally Plaintiff Ng worked more than that, anywhere from 28 hours up to 40.5 hours a week after discounting for breaks. (Ng Affidavit ¶ 15).

   c. Plaintiff Ng was typically at work for more than 10 hours a day for 1 to 2 days each week. (Ng Affidavit ¶ 16).

   d. Plaintiff Ng was paid an hourly rate, but was paid less than the minimum wage. (Ng Affidavit ¶ 17).

   e.

   f. Plaintiff Ng never clocked in and out. Plaintiff Ng had to sign a sheet with his scheduled start and end time and scheduled working hours after breaks. The sheets did not show the exact hours he worked. (Ng Affidavit ¶ 19).

   g. Plaintiff Ng usually arrived 5 to 10 minutes before his scheduled shift time. (Ng Affidavit ¶ 20).

   h. Plaintiff Ng sometimes worked approximately 15 to 20 minutes past his scheduled end time to finish up what he was working on. (Ng Affidavit ¶ 21).

112. For the period of April 2014 through July 2015:

a. Plaintiff Ng's hours varied a lot and he worked anywhere from as few as 26 hours per week to as many as 46 hours per week, after discounting for breaks. (Ng Affidavit ¶ 22).

b. Plaintiff Ng was typically at work for more than 10 hours a day for 1 to 3 days each week. (Ng Affidavit ¶ 23).

c. Plaintiff Ng got most, but not all of the spread of hours pay he was owed. (Ng Affidavit ¶ 24).

d. Plaintiff Ng was paid by the hour, but it was less than the minimum wage. (Ng Affidavit ¶ 25).

e. Plaintiff Ng was not paid the correct overtime wage rate. (Ng Affidavit ¶ 27).

f. Plaintiff Ng never clocked in and out. Plaintiff Ng had to sign a sheet with his scheduled start and end time and scheduled working hours after breaks. The sheets did not show the exact hours he worked. (Ng Affidavit ¶ 28).

g. Plaintiff Ng usually arrived 5 to 10 minutes before his scheduled shift time. (Ng Affidavit ¶ 29).

h. Plaintiff Ng sometimes worked approximately 15 to 20 minutes past his scheduled end time to finish up what he was working on. (Ng Affidavit ¶ 30).

113. For the period of August 2015 through December 2016:

a. Plaintiff Ng typically worked 33 to 35 hours per week. Occasionally he worked a few hours more or a few hours less. (Ng Affidavit ¶ 31).

b. Plaintiff Ng was paid by the hour but it was less than the minimum wage. (Ng Affidavit ¶ 32).

c. Plaintiff Ng was paid for some, but not all, of his spread of hours. (Ng Affidavit ¶ 33).

    i.    Plaintiff Ng never clocked in and out. Plaintiff Ng had to sign a sheet with his scheduled start and end time and scheduled working hours after breaks. The sheets did not show the exact hours he worked. (Ng Affidavit ¶ 35).

    j.    Plaintiff Ng usually arrived 5 to 10 minutes before his scheduled shift time. (Ng Affidavit ¶ 36).

    k.    Plaintiff Ng sometimes worked approximately 15 to 20 minutes past his scheduled end time to finish up what he was working on. (Ng Affidavit ¶ 37).

**Plaintiff Jian Wei Xu (aka "Ken")**

114. Plaintiff Xu went by the name "Ken" at Chef Yu. (Xu Affidavit ¶ 3).

115. When he was hired, Plaintiff Xu did not receive any kind of notice or statement informing him of how he would be paid. (Xu Affidavit ¶ 5).

116. For the period of July 2011 through July 2013:

    a.    Plaintiff Xu was paid a flat rate of $300 every two weeks, or $600 per month, plus tips. (Xu Affidavit ¶ 19).

    b.    Plaintiff Xu typically worked 59 to 62 hours per week. (Xu Affidavit ¶ 20).

    c.    Plaintiff Xu was typically at work for more than 10 hours a day for 5 days each week. (Xu Affidavit ¶ 20).

    d.    Plaintiff Xu did not receive spread of hours pay of an additional hour for every day he was at work for more than 10 hours.  (Xu Affidavit ¶ 22).

    e.    Plaintiff Xu was paid less than the minimum wage rate. (Xu Affidavit ¶ 24).

    f.    Plaintiff Xu did not receive any overtime pay for the hours he worked over 40 each week. (Xu Affidavit ¶ 21).

    g.    Plaintiff Xu did not receive any wage notices or paystubs. (Xu Affidavit ¶ 25).

    h. Plaintiff Xu never clocked in and out and he does not know if his actual working hours were tracked by the restaurant in any way. (Xu Affidavit ¶ 26).

    i. Plaintiff Xu usually arrived 5 to 10 minutes before his scheduled shift time, changed into his uniform, and would start working right away. (Xu Affidavit ¶ 27).

    j. Plaintiff Xu often worked later than his scheduled end time, usually 15 to 30 minutes, and when he was able to leave depended on the customers. Plaintiff Xu could not end his shift if customers were still there, and sometimes Douglas let customers come in and put in orders past closing time. (Xu Affidavit ¶ 28).

117. For the period of August 2013 through April 2015:

    a. Plaintiff Xu generally worked 43 hours per week after discounting for breaks. (Xu Affidavit ¶ 29).

    b. There were quite a few weeks that he worked more hours, up to 53 hours per week. (Xu Affidavit ¶ 29).

    c. Plaintiff Xu was typically at work for more than 10 hours a day for 5 or 6 days each week. (Xu Affidavit ¶ 30).

    d. Plaintiff Xu was paid by the hour, but was paid less than the minimum wage rate. (Xu Affidavit ¶ 31).

    e. Plaintiff Xu was not paid for all the hours he worked. (Xu Affidavit ¶ 34).

    f. Plaintiff Xu was sometimes paid spread of hours and sometimes not. (Xu Affidavit ¶ 36).

    g. Plaintiff Xu did not get spread of hours for most of 2014. (Xu Affidavit ¶ 36).

    h. Plaintiff Xu was not paid the correct overtime rate. (Xu Affidavit ¶ 35).

    i.    Plaintiff Xu never clocked in and out. There was a time sheet up hanging up on the wall but it did not track the exact hours he worked. (Xu Affidavit ¶ 37).

    j.    Plaintiff Xu usually arrived 5 to 10 minutes before his scheduled shift time, changed into his uniform, and would start working right away.   (Xu Affidavit ¶ 38).

    k.    Plaintiff Xu often worked later than his scheduled end time, usually 15 to 30 minutes, and when he was able to leave depended on the customers. Plaintiff Xu could not end his shift if customers were still there, and sometimes Douglas let customers come in and put in orders past closing time. (Xu Affidavit ¶ 39).

### Wei Yan Yan v. 520 Asian Rest. Corp.

118. On April 11, 2013, Defendant 520 Asian Restaurant Corp. d/b/a Chef Yu and Defendant Teo Su Jin ("Douglas") were sued by an individual Wei Yan Yan who was employed at Chef Yu as a deliveryman from 2006 to 2012 (hereinafter referred to as the "Yan action"). *Wei Yan Yan v. 520 Asian Rest. Corp.*, No. 13-CV-2417 (KNF), 2014 U.S. Dist. LEXIS 174259 (S.D.N.Y. Dec. 14, 2014). (Exhibit 41).

119. Wei Yan Yan sued Chef Yu and Douglas under the FLSA, 29 U.S.C. §§ 201 *et seq.*, NYLL §§ 650 *et. seq.*, NYLL §§ 195 and 198, and 12 NYCRR §§ 146-1.4 and 137-1.3, for failure to pay minimum wages, overtime wages, spread of hours pay, and for failure to provide wage notices. *Id*.

120. A bench trial was held in the Yan action on July 1, 2014 before United States Magistrate Judge Kevin Nathaniel Fox, and the Court found as follows:

    a.    520 Asian Restaurant Corp. owns Chef Yu restaurant in midtown Manhattan. *Id*.

    b.    Douglas owned and operated Chef Yu restaurant at all relevant times. *Id*.

c.  Defendants 520 Asian Restaurant Corp. and Douglas were the plaintiff's employers. *Id*.

d.  The plaintiff worked, typically, at least six days per week throughout his employment with the defendant, exclusive of any sick days. *Id*.

e.  The defendant did not keep any records of the plaintiff's work hours. *Id*.

f.  For the first two years of the plaintiff's employment, the defendants paid him $350 twice per month, for a total of $700 per month. *Id*.

g.  For the remainder of the plaintiff's employment, the defendants paid him $500 twice per month, for a total of $1,000 per month. *Id*.

h.  The plaintiff also received approximately $1,400 per month in tips from customers in 2007, and approximately $2,000 per month beginning in 2008. *Id*.

i.  The defendant's payments to the plaintiff did not vary based on his hours worked.

j.  The defendants did not maintain payroll records. *Id*.

k.  The defendants did not provide wage and hours-related notices to the plaintiff. *Id*.

l.  The defendants failed to post notices at their restaurant explaining the laws governing wages and hours. *Id*.

m.  The defendant violated the provisions of sections 206 and 207 of the FLSA.

n.  The defendants violated NYLL Article 6. *Id*.

o.  The defendants were liable to the plaintiff in the amount of his unpaid minimum wages, overtime compensation, and spread of hours. *Id*.

p.  The defendants were liable to the plaintiff for damages he incurred commencing from April 11, 2007, under the New York Labor Law, and April 11, 2010, under the FLSA. *Id*.

q. The defendants were not entitled to use the tip credit against the plaintiff's minimum ages under FLSA because they failed to inform him about the provisions of 19 USC 203(m). *Id*.

r. The defendants were not entitled to use the tip credit against the plaintiff's minimum wages under New York's Hospitality Industry regulations, for the period commencing January 1, 2011. *Id*.

s. Penalties were warranted for defendants' failure to provide requisite notices under New York law. *Id*.

t. The defendants failed to show that the conduct giving rise to this FLSA action was undertaken in good faith and that they had reasonable grounds for believing that their conduct was not a violation of the FLSA, and the plaintiff was entitled to liquidated damages under FLSA in an amount equal to the amount of the minimum wage and overtime compensation owed during the three-year statutory period. *Id*.

u. The defendants failed to show they had a good faith basis to believe that their underpayment of wages was in compliance with the law, and the plaintiff was entitled to liquidated damages under New York law. *Id*.

v. The plaintiff was entitled to prejudgment interest, under New York law, computed at the rate of nine percent per annum from a single reasonable intermediate date. *Id*.

w. The plaintiff is entitled to post-judgment interest. *Id*.

## PLAINTIFF'S PROPOSED CONCLUSIONS OF LAW

**Conclusions Applicable to All Plaintiffs**

### I.   Jurisdiction

1.   The court has subject matter jurisdiction of this action. 29 U.S.C. § 216(b), 28 U.S.C. §§ 1331, 1332, and 1337.

2.   This Court also has supplemental jurisdiction under 28 U.S.C. § 1367(a) of the claims brought under New York Labor Law because those claims arise out of the same common nucleus of operative fact as the federal claim and are so closely related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.  *See, e.g., Ouedraogo v. Durso Assocs., Inc.*, No. 03 CV 1851 (RLC), 2005 WL 1423308, at *2 (S.D.N.Y. June 16, 2005).

3.   The statute of limitations under FLSA, 29 U.S.C. § 255(a), for willful violations is three (3) years.

4.   The statute of limitations under NYLL § 198(3) is six (6) years.

5.   Venue is proper within this District under 28 U.S.C. § 1391(b) because Defendants regularly conduct business within the Southern District of New York and because the majority of the events giving rise to this litigation occurred in the Southern District of New York.

### II.  Minimum Wage and Overtime Violations

6.   The FLSA and the NYLL define the term "employer" broadly for purposes of determining those who bear liability for unpaid wages.  *See, e.g., Irizarry v. Catsimatidis*, 722 F.3d 99, 103 (2d Cir. 2013); *see* 29 U.S.C. § 203(d) (defining "employer" to include "any person acting directly or indirectly in the interest of an employer in relation to an employee");

NYLL §§ 2(6), 651(6), 190(3).

7.  An "Employee" is defined in the FLSA as "any individual employed by an employer." 29
    U.S.C. § 203(e)(1). An "employer" includes "any person acting directly or indirectly in the
    interest of an employer in relation to an employee." 29 U.S.C. § 203(d). The NYLL defines
    "employee" as "any person employed for hire by an employer in any employment" and defines
    "employer" as "any person, corporation, limited liability company, or association employing
    any individual in any occupation, industry, trade, business or service." NYLL § 190(3); *see
    also* NYLL §§ 2(5) and (6); 651(5) and (6).

8.  Defendants were therefore employers of Plaintiffs, who were employees, as defined by the
    FLSA, 29 U.S.C. § 203(d), Articles 6 and 19 of the NYLL, and NYCRR § 146.

9.  Any employee is entitled to a minimum wage and overtime protections under the FLSA and
    the NYLL. The FLSA "embodies a uniform national policy of guaranteeing compensation for
    all work or employment engaged in by employees covered by the Act." *Moon v. Kwon*, 248 F.
    Supp. 2d 201, 227 (S.D.N.Y. 2002) (internal quotations and citations omitted).

10. Under both federal and New York state law, an employee must be paid a minimum wage. 29
    U.S.C. §206; NYLL §652.

11. Under the FLSA, the minimum wage rate that employers must pay their employees has been
    $7.25 per hour since July 24, 2009. 29 U.S.C. §206(a)(1).

12. From July 24, 2009 until December 31, 2013, the New York minimum wage rate was the same
    as the FLSA rate, $7.25. NYLL. §652. The New York minimum wage rate increased from
    $7.25 to $8.00 on December 31, 2013; increased from $8.00 to $8.75 on December 31, 2014;
    and increased from $8.75 to $9.00 on December 31, 2015. NYLL §652. The minimum wage
    in New York City, which was applicable to the Plaintiffs, thereafter, increased annually as

follows: to $11.00 per hour on and after December 31, 2016; to $13.00 per hour on and after December 31, 2017; and to $15.00 per hour on and after December 31, 2018. NYLL §652; 12 NYCRR §§ 146-1.2.

13. Under both federal and New York state law, an employee must be paid at the rate of one and one-half times the employee's regular hourly rate for each hour the employee works in excess of 40 hours in a given workweek.  29 U.S.C. § 207(2)(C); 12 NYCRR §§ 146-1.4

14. Defendants failed to pay Plaintiffs at the applicable legal minimum hourly wage, in violation of 29 U.S.C. § 206(a) and NYLL §652.

15. Defendants also failed to pay the Plaintiffs the correct overtime pay in accordance with both federal and state laws.  29 U.S.C. § 207(2)(C); 12 NYCRR §§ 146-1.4.

### III. <u>Hours Worked</u>

16. Under the FLSA, employers are required to "make, keep, and preserve" records of their employees' "wages, hours, and other conditions and practices of employment." 29 U.S.C. § 211(c). Employers must keep payroll records for at least three years and earnings records for at least two years. 29 C.F.R. §§ 516.5(a), 516.6(a)(1).

17. Under the NYLL, employers must "establish, maintain, and preserve" detailed weekly payroll records for each employee for not less than six years. NYLL § 195, 661; 12 NYCRR § 146-2.1(a).

18. If an employer does not maintain accurate and complete records, courts employ a burden-shifting scheme to determine the number of hours an employee worked. First, the employees must put forth evidence that shows they performed work for which they were improperly compensated and that the associated amount and extent of that work is a matter of just and

reasonable inference. *See Marquez v. Erenler, Inc.*, No. 1:12-CV-8580-GHW, 2014 WL 12769277, at *3 (S.D.N.Y. Oct. 22, 2014) (J. Woods).

19. The employees' burden is not high and it is well-established that it can be met through estimates based on their own recollection. *See Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 362 (2d Cir. 2011). Once the employees have made this showing, the burden shifts to the employer to put forth evidence that either shows the precise amount of work performed by the employee or negates the reasonableness of the inference to be drawn from the employee's evidence. *Id*.

20. In this case, since the Defendants required all Plaintiffs to sign documents that reflected the hours they were scheduled to work, not the actual hours they worked, which regularly exceeded their scheduled work hours, and did not typically maintain records of how many actual hours each Plaintiff worked, "the Court must accept plaintiffs' recollections of the hours they worked unless [D]efendants can produce evidence to the contrary." *Marquez*, 2014 WL 12769277, at *3. Defendants have not done so and thus the Plaintiffs' recollections are to be given controlling weight. *See id.*, 2014 WL 12769277, at *3.

### IV. <u>Tip Credit, Tip Retention and Spread of Hours Violations</u>

21. Employers of tipped employees are entitled to use employees' tip income as a credit toward reaching the statutory minimum wage amount. *See* 29 U.S.C. §§ 203(m), 203(t).

22. An employer may take a credit towards the basic minimum hourly rate if a service employee or food service worker receives enough tips and if the employee has been notified of the tip credit as required in section 12 NYCRR § 146-2.2; *see* 12 NYCRR § 146-1.3.

23. An employer may not avail itself of the tip credit unless it notifies tipped employees of its intention to include tip income when calculating wages actually paid for minimum wage

purposes and ensures that all tips received by tipped employees have been retained by the employees. 29 U.S.C. § 203(m); *see Nicholson v. Twelfth Street Corp.*, No. 09 Civ. 1984 (HB), 2010 WL 1780957, at *2 (S.D.N.Y. May 4, 2010) (citations omitted).

24. Defendants were ineligible for a tip credit against their minimum wage obligations with regard to Plaintiffs because, inter alia, the Defendants did not notify the Plaintiffs of the applicable legal provisions of the FLSA or NYLL, or of Defendants' intention to claim a tip credit against their minimum wage obligations to reduce the applicable minimum wage, and at times Defendants required Plaintiffs to remit portions of the tip pools to non-tipped employees and/or Defendant Restaurants.

25. In addition, no employer, nor an agent of the employer, may retain any part of a gratuity or of any charge purported to be a gratuity for an employee. NYLL § 196-d; S*alinas v. Starjem Rest. Corp.*, 123 F. Supp. 3d 442, 470 (S.D.N.Y. 2015)

26. The Plaintiffs had their tips taken by the Defendants in violation of 29 U.S.C. § 203(m); NYLL § 196-d; and 12 NYCRR § 146-1.3 and must be paid compensation for all tips that were taken.

27. Under the NYLL, an employee is entitled to an extra hour's pay on any day she works for which "the spread of hours exceeds 10 hours." 12 NYCRR § 146-1.6(a). Spread of hours is defined as the time from the beginning to the end of the workday and applies to all who work in restaurants regardless of their rate of pay. *Id*. § 146-1.6.

28. The Defendants therefore must pay each of the Plaintiffs an extra hour at the basic minimum hourly rate for each working day in which each Plaintiff's spread of hours exceeded 10 hours and for which they were not paid in violation of 12 NYCRR § 146-1.6.

## V.  Liquidated Damages

29. Employees are also entitled to liquidated damages under the FLSA in an amount equal to their

unpaid wages, unless "the employer shows to the satisfaction of the court that [his] act or omission ... was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act." 29 U.S.C § 260; *see* 29 U.S.C § 216(b). Liquidated damages under the FLSA are not imposed as a penalty, but as "compensation to the employee occasioned by the delay in receiving wages due caused by the employer's violation of the FLSA." *McLean v. Garage Mgmt. Corp.*, 10-cv-3950 (DLC), 2012 WL 1358739, at \*5 (S.D.N.Y. April 19, 2012) (quoting *Herman v. RSR Sec. Svcs. Ltd.*, 172 F.3d 132, 142 (2d Cir. 1999)).

30. Defendants may only avoid liquidated damages under the FLSA if they demonstrate that they "acted in subjective good faith with objectively reasonable grounds for believing that [their] acts or omissions did not violate the FLSA." *Barfield v. New York City Health and Hospitals Corp.*, 537 F.3d 132, 150 (2d Cir. 2008); *see* 29 U.S.C. § 260. Defendants' burden in this regard is high: "to establish the requisite subjective good faith, an employer must show that it took active steps to ascertain the dictates of the FLSA and then act[ed] to comply with them." *McLean*, 2012 WL 1358739, at \*5 (quoting Barfield, 537 F.3d at 150). In cases such as this one, "double damages [are] the norm and single damages the exception*." Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 142 (2d Cir. 1999).

31. Employees may also recover liquidated damages under the NYLL. The current law, as amended in 2009, put the burden of proving a good faith defense on the employer: employees are entitled to liquidated damages under the NYLL "unless the employer proves a good faith basis for believing that its underpayment of wages was in compliance with the law." NYLL §

198(1-a).

32. Therefore, the Plaintiffs are entitled to 100% in liquidated damages under the FLSA and NYLL.

**VI.  Wage Theft Prevention Act Violation**

33. Pursuant to the Wage Theft Prevention Act, NYLL 195(3) ("WTPA"), and 12 NYCRR § 146-2.3, an employer is required to provide its employee with a paystub that accurately reflects the rate of pay, the hours worked, and the amounts deducted. The paystubs must include: the employee's rate or rates of pay; the overtime rate of pay, if the employee is subject to overtime regulations; the basis of wage payment (per hour, per shift, per week, piece rate, commission, etc.); any allowances the employer intends to claim as part of the minimum wage including tip, meal, and lodging allowances; the regular pay day; the employer's name and any names under which the employer does business (DBA); the physical address of the employer's main office or principal place of business and, if different, the employer's mailing address; and the employer's telephone number.

34. From April 9, 2011 until prior to February 25, 2015, the failure of an employer to provide a paystub to their employees was a violation for which plaintiffs could receive $100 per work week in damages, with a cap of $2,500. *See Perez v. Platinum Plaza 400 Cleaners, Inc.*, No. 12 CIV. 9353 PAC, 2015 WL 1881080, at *4 (S.D.N.Y. Apr. 24, 2015).

35. After February 25, 2015, the law was amended to allow for $250 in damages per day with a cap of $5,000. NYLL § 198-1(d).

36. Since Plaintiffs did not receive accurate paystubs each week that they worked, Defendants violated NYLL §§ 198-1(d) and 195(3) and 12 NYCRR § 2.3 and are liable to each of the Plaintiffs in the statutory maximum amount of damages of $2,500 or $5,000 per Plaintiff, plus

attorneys' fees and costs.

**VII.**      <u>Uniforms</u>

37. Where an employer does not maintain required uniforms for any employee, the employer shall

     pay the employee, in addition to the employee's agreed rate of pay, uniform maintenance pay

     at the weekly rate set forth in 12 NYCRR § 146-1.7(a)(1). During the relevant time, Defendants

     failed to provide Plaintiffs uniform maintenance pay, in violation of 12 NYCRR § 146-1.7 and

     therefore must pay each of the Plaintiffs the appropriate weekly rate as set forth in said section

     for all weeks worked by each Plaintiff.

38. When an employee purchases a required uniform, he or she shall be reimbursed by the

     employer for the total cost of the uniform no later than the next payday according to 12

     NYCRR § 146-1.8(a). During the relevant time, Defendants failed to reimburse Plaintiffs for

     the cost of required uniforms, in violation of 12 NYCRR § 146-1.8 and therefore must pay

     each Plaintiff an amount equal to the total costs of all uniforms purchased.

39. Defendants' violations of the NYLL and its implementing regulations, as described, were

     willful and intentional.

40. Due to Defendants' violations of the NYLL, Plaintiffs are entitled to recover from Defendants,

     jointly and severally, the uniform maintenance pay and the costs of required uniforms,

     liquidated damages, as well as reasonable attorneys' fees, costs of the action, and interest.

**VIII.**      <u>Pre-Judgment Interest</u>

41. The liquidated damages provisions of the FLSA and NYLL serve different purposes: such

     damages are compensatory under the FLSA and punitive under the NYLL, hence plaintiffs

     may recover both. Under New York law, pre-judgment interest—like an FLSA liquidated

     damages award—is compensatory. *See J. D'Addario & Co. v. Embassy Indus., Inc.*, 20 N.Y.3d

113, 117 (2012) ("The principle behind prejudgment interest is that the breaching party should compensate the wronged party for the loss of use of the money."). Thus, an award of pre-judgment interest will not be awarded for a claim made pursuant to the FLSA in addition to an award of liquidated damages. *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1064 (2d Cir. 1988).

42. However, since "NYLL liquidated damages are punitive—rather than compensatory—in nature, pre-judgment interest on an NYLL wages or liquidated damages award is not duplicative where there is no corresponding FLSA liquidated damages award." *Marquez v. Erenler, Inc.*, No. 1:12-CV-8580-GHW, 2014 WL 12769277, at *16 (S.D.N.Y. Oct. 22, 2014) (J. Woods). Plaintiffs are owed pre-judgment interest for damages awarded under the NYLL which are outside the FLSA statute of limitations and for an amount Plaintiffs are not awarded as FLSA liquidated damages. *See McLean v. Garage Mgmt. Corp.*, 10-cv-3950 (DLC), 2012 WL 1358739, at *11 (S.D.N.Y. Apr. 19, 2012) (quotations omitted); NY C.P.L.R. § 5001(a).

43. New York has an interest rate of nine percent *per annum*.  NY C.P.L.R. § 5004.

44. In wage and hour cases, "courts generally compute interest from a median date between the earliest ascertainable date the cause of action existed and the date the action was filed or last date the cause of action existed." *Marquez v. Erenler, Inc.*, No. 1:12-CV-8580-GHW, 2014 WL 12769277, at *16 (S.D.N.Y. Oct. 22, 2014) (J. Woods).

45. Therefore, Plaintiffs must be awarded pre-judgement interest at a rate of nine percent annually calculated from the midpoint of the Plaintiffs' respective NYLL claims until the date of judgment. Any delay in payment shall result in post-judgment interest accumulating at the same rate of nine percent *per annum*. NY C.P.L.R. § 5004.

## IX. Attorneys' Fees and Costs

46. The FLSA and NYLL both provide for an award of reasonable attorneys' fees as well as costs

incurred to a successful plaintiff. *See* 29 U.S.C. 216(b); N.Y Lab. Law §663; NYLL 198(1-a). Plaintiffs' counsel shall make an application for attorneys' fees after the conclusion of this case.

### X. Amounts Owed to Each Plaintiff

47. Due to Defendants' willful violations of the FLSA and NYLL, Plaintiffs are entitled to recover from Defendants, jointly and severally, all wages owed for minimum wage violations, overtime violations, and spread of hours violations, as well as tip appropriation damages, uniform maintenance pay, the costs of required uniforms, paystub violation penalties; plus the applicable liquidated damages, reasonable attorneys' fees, costs of the action, and the applicable pre-judgment and post-judgment interest for the time periods for which the Plaintiffs worked for the Defendants during the applicable statutes of limitations.

48. Plaintiff Chia is owed $58,622.46 in unpaid minimum wages and overtime, $5,843.25 in unpaid spread of hours wages, $2,732.35 in unpaid uniform allowances, $67,198.05 in liquidated damages, $5,000.00 in wage notice violations, plus reasonable attorneys' fees, costs of the action, and the applicable pre-judgment and post-judgment interest. (Exhibit 43).

49. Plaintiff R.G. Wu is owed $58,357.67 in unpaid minimum wages and overtime, $5,715.50 in unpaid spread of hours wages, $2,748.10 in unpaid uniform allowances, $66,821.27 in liquidated damages, $5,000.00 in in wage notice violations, plus reasonable attorneys' fees, costs of the action, and the applicable pre-judgment and post-judgment interest. (Exhibit 43).

50. Plaintiff Y.M. Lin is owed $62,060.07 in unpaid minimum wages and overtime, $5,555.75 in unpaid spread of hours wages, $2,738.55 in unpaid uniform allowances, $70,354.37 in liquidated damages, $5,000.00 in in wage notice violations, plus reasonable attorneys' fees,

costs of the action, and the applicable pre-judgment and post-judgment interest. (Exhibit 43).

51. Plaintiff Wu is owed $24,862.00 in unpaid minimum wages and overtime, $2,247.50 in unpaid spread of hours wages, $558.00 in unpaid uniform allowances, $27,667.50 in liquidated damages, $2,500.00 in in wage notice violations, plus reasonable attorneys' fees, costs of the action, and the applicable pre-judgment and post-judgment interest. (Exhibit 43).

52. Plaintiff Lin is owed $6,483.68 in unpaid minimum wages and overtime, $14,202.00 in unpaid spread of hours wages, $3,622.30 in unpaid uniform allowances, $24,307.98 in liquidated damages, $5,000.00 in in wage notice violations, plus reasonable attorneys' fees, costs of the action, and the applicable pre-judgment and post-judgment interest. (Exhibit 43).

53. Plaintiff Yu is owed $42,209.83 in unpaid minimum wages and overtime, $3,646.25 in unpaid spread of hours wages, $2,576.30 in unpaid uniform allowances, $48,432.38 in liquidated damages, $5,000.00 in in wage notice violations, plus reasonable attorneys' fees, costs of the action, and the applicable pre-judgment and post-judgment interest. (Exhibit 43).

54. Plaintiff Dong is owed $13,804.48 unpaid minimum wages and overtime, $1,786.50 in unpaid spread of hours wages, $706.80 in unpaid uniform allowances, $16,297.78 in liquidated damages, $2,500.00 in in wage notice violations, plus reasonable attorneys' fees, costs of the action, and the applicable pre-judgment and post-judgment interest. (Exhibit 43).

55. Plaintiff Hing is owed $55,450.06 in unpaid minimum wages and overtime, $4,537.00 in unpaid spread of hours wages, $2,813.65 in unpaid uniform allowances, $62,800.71 in liquidated damages, $5,000.00 in in wage notice violations, plus reasonable attorneys' fees, costs of the action, and the applicable pre-judgment and post-judgment interest. (Exhibit 43).

56. Plaintiff Ng is owed $14,157.33 in unpaid minimum wages and overtime, $873.25 in unpaid spread of hours wages, $1,565.55 in unpaid uniform allowances, $16,596.13 in liquidated

damages, $5,000.00 in in wage notice violations, plus reasonable attorneys' fees, costs of the action, and the applicable pre-judgment and post-judgment interest. (Exhibit 43).

57. Plaintiff Xu is owed $43,796.02 in unpaid minimum wages and overtime, $3,320.50 unpaid spread of hours wages, $1,671.70 in unpaid uniform allowances, $48,788.22 in liquidated damages, $5,000.00 in in wage notice violations, plus reasonable attorneys' fees, costs of the action, and the applicable pre-judgment and post-judgment interest. (Exhibit 43).

58. The judgment against Defendants should provide that if any amounts remain unpaid ninety days after issuance of the judgment, or ninety days after expiration of the time to appeal and no appeal is then pending, whichever is later, the total amount of the judgment shall automatically increase by fifteen percent. N.Y. Lab. Law §198(4).

**Conclusions Applicable to Plaintiffs Wai Ho Ng and Gui Xiang Dong**

59. Defendants failed to supply Plaintiffs Wai Ho Ng and Gui Xiang Dong with time-of-hire notices as required by NYLL § 195(1). As of April 9, 2011, NYLL § 195(1) has required that employers provide employees a notice at the time of hiring in English and in the employee's primary language (in this case Chinese), containing Plaintiffs' rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; hourly rate or rates of pay and overtime rate or rates of pay if applicable; the regular pay day designated by the employer in accordance with NYLL § 191; the name of the employer; any "doing business as" names use by the employer; the physical address of the employer's main office or principal place of business and a mailing address if different; the telephone number of the employer; plus, such other information as the commissioner deems material and necessary.

60. Through their knowing or intentional failure to provide Plaintiffs with the wage notices

required by the NYLL, Defendants have willfully violated NYLL §§ 190 et. seq., and the supporting New York State Department of Labor Regulations.

61. "Prior to February 25, 2015, employers were required to provide employees with wage notices at the time of their hiring and, subsequently, annually. N.Y. Lab. Law. § 195(1)(a). This requirement went into effect on April 9, 2011, and allowed for recovery in the amount of $50 per week with a cap of $2500." *Perez v. Platinum Plaza 400 Cleaners, Inc.*, No. 12 CIV. 9353 PAC, 2015 WL 1881080, at *4 (S.D.N.Y. Apr. 24, 2015).

62. Due to their violation of NYLL §§ 195(1) and 198-1(b), Defendants must pay each of Plaintiffs Wai Ho Ng and Gui Xiang Dong the statutory maximum amount of $2,500 or $5,000, together with costs and reasonable attorney's fees.

**Conclusions Applicable to Plaintiff Cindy Lin**

63. Plaintiffs are protected from retaliation under NYLL § 215(1)(a), which provides that, "[n]o employer or his or her agent … or any other person, shall discharge, threaten, penalize, or in any other manner discriminate or retaliate against any employee (i) because such employee has made a complaint to his or her employer or to the commissioner, or his or her authorized representative, or to the attorney general or any other person, that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates any provision of this chapter, or any order issued by the commissioner (ii) because such employer or person believes that such employee has made a complaint … that the employer has violated any provision of this chapter … (iii) because such employee has caused to be instituted or is about to institute a proceeding under or related to this chapter…"

64. Plaintiffs' filing of the instant lawsuit constituted a "complaint" and/or a "proceeding under or

related to this chapter" under NYLL § 215.

65. Defendants engaged in unlawful retaliation in violation of NYLL § 215 by retaliating against Plaintiff Cindy Lin and reducing her hours worked and compensation because she filed the instant lawsuit.

66. As a proximate result of Defendants' retaliation, Plaintiff Cindy Lin suffered damages including lost past and future income.

67. Due to Defendants' violations of NYLL § 215, the Defendants must pay a civil penalty in the amount of the statutory maximum of $10,000 to Plaintiff Cindy Lin, plus liquidated damages, interest, attorneys' fees and costs.

Dated: New York, New York
       September 3, 2019

                                        VIRGINIA & AMBINDER, LLP
                                   By:        s/LaDonna M. Lusher
                                        LaDonna M. Lusher, Esq.
                                        Kara S. Miller, Esq.
                                        Michele A. Moreno, Esq.
                                        40 Broad Street, Seventh Floor
                                        New York, New York 10004
                                        Tel:    (212) 943-9080
                                        Fax:    (212) 943-908
                                        llusher@vandallp.com

                                        TAKEROOT JUSTICE
                                        S. Tito Sinha, Esq.
                                        Farrell A. Brody, Esq.
                                        Eliseo Cabrera, Esq.
                                        123 William Street, Sixteenth Floor
                                        New York, New York 10038
                                        Tel:    (646) 459-3020
                                        Fax:    (212) 533-4598
                                        tsinha@takerootjustice.org

                                        *Attorneys for the Plaintiffs*